HARRY FENNELL'S CASE.

Suffolk.    November 4, 1931. — December 4, 1931.

Present: RUGG, C.J., PIERCE, WAIT, SANDERSON, & FIELD, JJ.

*Workmen's Compensation Act,* Injuries to which act applies. *Evidence,* Presumptions and burden of proof.

Upon an appeal by the insurer from a decree allowing a claim under the workmen's compensation act by an employee of a manufacturer of fused lenses who was suffering from lead poisoning, the insurer conceded that there was evidence which warranted the Industrial Accident Board's finding that the employee was suffering from lead poisoning at the time he was forced to cease work, that the cumulative effect of the poisoning resulted in a personal injury on the date specified, and that the personal injury was sustained in the course of employment; but contended that the claimant did not sustain the burden of establishing by a fair preponderance of evidence that the personal

injury arose out of the employment. It appeared that for several years the employee was constantly exposed to the danger of lead poisoning by the practice of licking the fused lenses, composed in part of lead glass, and an impartial physician reported that "Chemically speaking it is conceivable that the continuous contact of saliva with lead glass or this coating could introduce lead into the system." *Held,* that such evidence warranted an inference, not merely conjectural and speculative, that there was a causal relation between the removal of the coating on the fused lead glass in the manner described and the lead poisoning of the employee; and the decree was affirmed.

CERTIFICATION to the Superior Court under the provisions of the workmen's compensation act of a decision by the Industrial Accident Board, awarding compensation in the circumstances described in the opinion.

In the Superior Court, the case was heard by *Lummus,* J., by whose order there was entered a final decree awarding compensation. The insurer appealed.

The case was submitted on briefs.

*S. S. Bean & E. W. Sawyer,* for the insurer.

*J. S. C. Nicholls,* for the claimant.

PIERCE, J. This is a claim for compensation under G. L. c. 152. The claim was made on October 17, 1930, giving the time of the injury as December 10, 1928. The place of the injury is stated as follows: "Factory of Lloyd's Company, 315 Washington Street, 1906–1922, and 51 Chardon Street 1922–1928." The cause of the injury is given as "lead poisoning" and the nature of injury "wrist drop in both hands and utter loss of use of both hands." It is agreed that the employee's average weekly wages were $55. The member of the Industrial Accident Board held hearings on January 9, 1931, and on April 10, 1931. "All of the material evidence is reported." The single member made findings and filed a decision on May 1, 1931. The member found that the employee sustained a personal injury on December 10, 1928, arising out of and in the course of his employment. After review, the board on June 23, 1931, affirmed and adopted the findings and decision of the single member. The case having been certified to the Superior Court, after a hearing, the court on August 11, 1931, entered a decree in accordance with the

findings and decision of the board. From said decree the insurer appealed to this court on August 13, 1931.

The insurer states in its brief that "It may be assumed for the purposes of this appeal that there was evidence which warranted the board in finding that the employee was suffering from lead poisoning at the time he was forced to cease work; that the cumulative effect of the poisoning resulted in a personal injury on December 10, 1928; and that the personal injury was sustained in the course of employment." The claim is contested solely on the ground that the claimant did not sustain the burden of establishing by a fair preponderance of the evidence that the personal injury arose out of the employment.

The facts found by the member, which are undisputed or warranted by the reported testimony, disclose that the employee began work for the Andrew J. Lloyd Company in 1892; that he was an errand boy there for a few months and then was placed in the lens grinding department, of which he had charge; that in 1903, he originated the formula for making fused lenses, using the plain, or so called crown, glass and lead, or so called flint, glass; that a depression is ground in the crown glass and the flint glass is then laid in that depression; that the lenses are then put in a gas furnace and subjected to heat of thirteen hundred degrees Fahrenheit; that the flint glass melts into the crown glass; that they are left in the furnace until they are cool and then taken out and ground on both sides; that if there was a scratch or blur on the lenses they would not be salable; that in order to detect any imperfection the employee licked the lens on both sides with his tongue, because one can see through a translucent surface when it is wet much better than when dry; that the employee was never told not to do this and he felt it was sanitary because the lenses had been subjected to the heat and it was the quickest way to work. The employee testified that if there was a little bit of blue film on the lens he would lick that off.

The evidence supported the member's findings that after the lenses were taken out of the oven and ground they were polished with a white compound; that the employee continued

doing this work in the same way until 1924, when the first thing he noticed definitely about his condition was difficulty in buttoning his clothes; that he continued on this work and, in 1926, the number of lenses which he fused was cut down because the manufacturers could buy them cheaper than make them; that his condition grew pro- gressively worse.

The employee testified, and the member inferentially found, that the employee began to lose weight, was consti- pated and run down, was pale and thin, had trouble with his digestive organs, and that his arms as well as his hands began to atrophy. There was further testimony that he had all his teeth out in 1920 because of pyorrhea; that he was seen by several doctors and no treatment helped him; that he visited the Boston City Hospital in March, 1928, and was advised to continue work as long as possible, the diagnosis at that time being amyatrophic lateral sclerosis; that he continued work but, as he grew worse, was obliged to give up on December 10, 1928; that he worked four years after the condition first manifested itself to his knowledge. The mem- ber found on the evidence that, in 1927, the employee moved into a different house and, because of his condition, the water was examined and new pipes were installed; and further found, in substance, that because his condition had existed for nearly three years prior to that time and the evidence definitely shows an improvement about three months sub- sequent to his leaving work on December 10, 1928, "any lead which may have been in the pipes was not a cause of this man's condition."

Because it is admitted that there was evidence to warrant the board in finding that the employee was suffering from lead poisoning which resulted in a personal injury on Decem- ber 10; 1928, and that the personal injury was sustained in the course of his then employment, we put to one side any analysis of the conflicting testimony as to the nature of the admitted suffering of the employee and the findings of the member and the board thereon, and pass to the single issue whether the lead poisoning of the employee was causally related to his work.

The report of Dr. Hamilton of the Massachusetts Institute of Technology, to whom for an impartial report were submitted samples of crown glass and flint glass for chemical analysis, shows that the crown glass "showed no lead or other poisonous chemical present"; that of five samples marked "Flint Glass — Lloyd Lenses" three small lenses were selected at random; that these were analyzed chemically and all three were found to contain an appreciable quantity of lead contained in the silicate. The report further shows that there was submitted for chemical test a special sample consisting of two fused lenses on which a very small deposit or coating had apparently appeared during the fusion process; that an attempt to wash this coating off with dilute nitric acid failed, as the deposit was unchanged by this action and the washings gave no test of lead; that a solution of alkali was not used as a solvent for this coating since flint glass and other glasses are slightly soluble in alkali and no definite indication could have been obtained by this test; that the saliva of the normal human while nearly neutral in reaction is on the basic side of neutral or is alkaline; that "Chemically speaking it is conceivable that the continuous contact of saliva with lead glass or this coating could introduce lead into the system." This evidence, considered with the admitted fact that the employee was constantly exposed to the danger of lead poisoning by the practice of licking the fused lenses part of which was lead glass, warrants an inference, not merely conjectural and speculative, that there was a causal relation between the removal of the coating on the fused lead glass in the manner described and the lead poisoning of the employee. It follows that the finding of the single member and of the reviewing board that there was a personal injury to the employee which arose out of and in the course of his employment was warranted by the evidence, and that the decree of the Superior Court must be affirmed.

*So ordered.*